UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSALIND BLAIR, Personal
Representative of the Estate of
MARQUIS BLAIR, Deceased,

                  Plaintiff,                      No. 08-CV-15090

vs.                                        Hon. Gerald E. Rosen

WAYNE COUNTY DEPUTY
SHERIFF GREGORY HARRIS,

                  Defendant.
_____/

## OPINION AND ORDER REGARDING DETERMINATION OF DAMAGES

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on January 27, 2014

PRESENT:   Honorable Gerald E. Rosen
                   United States District Chief Judge

## I. INTRODUCTION

This tragic case presents a model of how not to litigate a Section 1983 damages claim. On the one hand, we have an absolute tragedy -- the death of a young man within just weeks of his older brother being shot and killed in a separate incident. Our hearts go out to the mother who has had to endure this double loss. On the other hand, we have a plaintiff's lawyer who failed to plead a state wrongful death claim, failed to aggressively pursue this case even after the Court pushed him to do so, and failed to put on any

1

cognizable evidence that would support punitive damages when given the chance.  The

resultant lack of record evidence has tied the Court's hands in issuing this damages

award.

## II.  PERTINENT FACTS

Plaintiff Rosalind Blair, in her capacity as personal representative of the estate of

her deceased son, Marquis Blair, filed a two-count Section 1983 Complaint in this Court

against Wayne County Deputy Sheriff Gregory Harris (Count I) and the County of

Wayne (Count II) alleging that, on August 5, 2007, Defendant Harris, who was at the

time off-duty, shot and killed her son, without justification, in violation of the Fourth and

Fourteenth Amendments of the United States Constitution.  On September 23, 2010, the

Court granted the County's Motion for Summary Judgment, finding that Plaintiff failed

to establish that Defendant Harris was acting under color of law when he shot Marquis

Blair and further failed to establish that any official policy or practice of Wayne County

was the moving force behind the alleged constitutional violation.

Wayne County is not representing or indemnifying individual Defendant Harris.

Harris never answered or otherwise responded to Plaintiff's Complaint, and a Default

Judgment of Liability was entered against him.[1]  The Court thereafter conducted a

---

[1]  Other than serve Deputy Harris with a copy of the Complaint, Plaintiff took no
independent action to prosecute this action against this individual defendant.  Plaintiff did
not apply for a clerk's entry of default until after the Court issued an Order to Show
Cause on May 4, 2009 directing Plaintiff to show cause why the case against Defendant
Harris should not be dismissed for lack of prosecution.  And, although the clerk promptly
entered Defendant Harris's default on May 19, 2009, Plaintiff took no independent action

hearing to determine damages.  The only witness to testify at the damages hearing was Rosalind Blair.  At the conclusion of Ms. Blair's testimony, Plaintiff's counsel asked for a damage award of $1,000,000.

After hearing the testimony and the arguments of counsel, the Court took the matter under advisement.  Thereafter, the Court ordered supplemental briefing on the damages issue.  Having reviewed and considered Plaintiff's testimony, counsel's arguments and the entire record of this matter, the Court now renders its decision on damages.

THE EVENTS OF AUGUST 5, 2007

According to the various police reports of the events of August 5, 2007 -- including witness statements and the Internal Affairs Department's Report of its interview with Defendant Harris -- the events giving rise to this action are as follows.

At approximately 1:00 a.m. on Sunday, August 5, 2007, Gregory Harris,[2] was dozing in the upstairs bedroom of his home on Flanders Street in Detroit when his stepdaughter, Rachel, yelled to him that there was someone inside his van (which was

---

to perfect that default during the ensuing year and a half, even after the Court had entered its September 23, 2010 Order granting the County's motion for summary judgment.  As a consequence, on December 2, 2010, the Court once again was compelled to issue an Order to Show Cause for lack of prosecution.  It was only in response to this second Show Cause Order that Plaintiff finally filed a Motion for entry of a Default Judgment against Defendant Harris.  After proof that Defendant Harris had been served with the motion was filed, the Court entered the Default Judgment of Liability on April 20, 2011.

[2] At the time of the events giving rise to this action, Harris's duty assignment with the Sheriff's Department was the Wayne County Jail.

3

parked in front of the house) trying to steal it.  Harris claims that, having discovered

evidence of a prior attempt to break into his van two weeks earlier, he went downstairs so

he could observe his vehicle through the front window.

Harris observed a black male, who was subsequently identified as Marquis Blair,

the Plaintiff's decedent, inside his van behind the steering wheel.  Harris ran back

upstairs and retrieved his personal SIG Sauer 9mm handgun, loaded it and ran back

downstairs.  He exited the front door with his gun drawn and yelled to Blair, "Halt. Stop.

Police.  It's a police officer's van."  According to Harris, Blair looked toward him,

extended his arm in his direction, with what Harris described as a long, shiny object in

his hand pointed at him.  Harris thought this object was a weapon and, therefore, feared

for his safety. [*See* Harris Statement to Internal Affairs Department, Wayne County

Motion to Dismiss, Dkt. # 9-5, p.1.]  Harris reacted by firing four or five shots at Blair

through the passenger window of the van.[3]

Blair did not return fire or otherwise respond to Harris's shots.  Rather, he ducked

under the steering wheel and exited the van through the open driver's side door.  Harris

approached the van, and as he moved toward the front end of the vehicle, Blair ran past

him.  According to Harris, as Blair ran by, he no longer saw the shiny object in his hand.

---

[3]  Blair's attorney argued in opposing the County's summary judgment motion that the "shiny object" Harris had seen was only a screwdriver, which Blair dropped while fleeing the scene.  However, no evidence establishing this "fact" was ever presented.  A screwdriver, however, was found by the Detroit Police on the street in front of Harris's house.

4

He stated, however, that while Blair was running away, he turned toward him and Harris thought he reached into his waistband. *Id*. at p. 4. Harris perceived this movement as an additional threat to his safety and fired several shots again at Blair as he pursued him. *Id.* All told, Harris shot 16 rounds at Blair, five of which struck the decedent. [Internal Affairs Report, Dkt. # 9-5, p. 8.] Blair fell to the ground at the intersection of Hayes and Houston-Whittier.

Harris stated that when he reached Blair, he attempted to check his vitals when he heard additional gunshots and saw a silver four-door Chrysler sedan stopped in the middle of Hayes. *Id.* He saw a passenger of the vehicle standing near the door of the car and saw muzzle flashes. Realizing he had already emptied his entire magazine from his weapon, and fearing for his life, Harris fled through alley and yelled to a neighbor on the way to call 911. *Id.*

Four witnesses interviewed by the Detroit Police on the scene corroborated Harris's version of Blair being in possession of an object perceived as a weapon. All of these witnesses further stated that they saw an individual drive up in a silver vehicle and take an object from Blair's hand as he lay on the ground before Harris reached him. Several other witnesses stated that they heard two different weapons being discharged in the incident.

The police later arrested two other individuals (presumably individuals who were in the silver car observed Harris and the witnesses) who admitted being accomplices of

Marquis Blair in the attempted theft of Harris's van.  One of the arrestees admitted they

fired at least one shot from a rifle at Harris as he stood over Blair at the intersection of

Hayes and Houston-Whittier.[4]

Marquis Blair was transported from the scene to St. John's Hospital in Detroit and

was pronounced dead on arrival.  Though the Wayne County Medical Examiner

pronounced Blair's death as a homicide, no criminal charges were brought against Harris.

The Prosecutor's Office determined that the homicide of Blair was committed in lawful

self-defense and in the apprehension of a fleeing felon.[5]

ROSALIND BLAIR'S TESTIMONY

Rosalind Blair, personal representative of the estate of Marquis Blair, testified at

the damages hearing.  Ms. Blair is also Marquis Blair's mother.  She, testified that, at the

time of his death, Marquis was 16 years old and was going to be in the 10th grade when

school started the next month.  She further testified that Marquis resided with her his

whole life (except for a few months when he was six years old when he lived with his

grandmother), and the two of them had a close relationship.

---

[4]  No weapon other than Defendant Harris's was recovered; however one assault
rifle casing was found near the center of Hayes.   The only other "weapon" recovered was
a 12" master mechanic screwdriver; Harris's stepdaughter, Rachel, told the police that
she saw Blair trying to force a screwdriver into the ignition of Harris's van.

[5]  Just days after the August 5, 2007 incident, Defendant Harris's home was
firebombed and destroyed. [*See* Internal Affairs Report, Dkt. #9-5, p. 5.]  Neither Harris
nor any of his family were at home at the time.  Though no arrests have been made,
Harris believes that the firebombing was related to the events of August 5, 2007.  *Id.*

According to Ms. Blair, Marquis also had a close relationship with his grandparents and his four siblings, three of whom were younger than Marquis. (Marquis's older brother was killed two months before Marquis.)  Marquis especially liked being a "big brother" to his younger brother and sisters.  Marquis did not really know his father.  His mother testified that Marquis's father was in jail until Marquis was 7 or 8 years old and that thereafter Marquis only saw his father "now and then."

Ms. Blair testified that she was, and still is, the primary provider in the family.  At the time of Marquis's death, she worked as a manager of a Burger King.  (She has since moved to Muncie, Indiana and is working at a McDonald's.)

As to what her son did for enjoyment, Ms. Blair said that Marquis liked listening to music, liked telling jokes and liked "hanging out" with his family.  He especially enjoyed family functions he would attend with his cousins.  Ms. Blair testified that Marquis did not participate in any school sports and did not play sports with his friends for fun, either, adding, by way of explanation, that her son was big and strong but "clumsy."

Ms. Blair further testified that, as far as she knew, Marquis did not mess with drugs.  However, prior to his death, he had been getting into some trouble outside of school and had been involved in several fights.  He was arrested twice before the night of the shooting, for fighting, and was once convicted.  But, Ms. Blair said she was never made aware that her son had gotten into stealing.

7

With regard to her son's death, Ms. Blair testified that she saw her son leave with his friend, Devon, and another boy early in the evening of August 4, 2007. She learned about his death at approximately 2:00 p.m. in the afternoon of the next day, August 5, when she got a telephone call from Devon, who was with Marquis on the night of the shooting. According to Ms. Blair, Devon actually had called her twice. The first time he called, he said that Marquis had been shot in the arm.[6] Devon then called a second time around 2:00 p.m. on August 5th and told her that Marquis was dead. Ms. Blair went to the hospital and saw her dead son. She testified, however, that she was not permitted to touch him.

Ms. Blair testified that she had a funeral for her son but that she could not have the kind of funeral she wanted because she did not have enough money to do so having just incurred the expense of her older son's funeral only two months earlier. To cope with Marquis's death, Ms. Blair said she sought counseling: she talked to her uncle who is a pastor, and with another pastor at her best friend's church.

In her Complaint, Plaintiff seeks an award of "punitive, exemplary or hedonic or any other damages available under Michigan law," plus "costs, interest and attorney fees." [*See* Complaint, Count I, prayer for relief, pp. 4-5] Plaintiff now asks the Court for

---

[6] Ms. Blair did not testify as to the time of this first call from Devon. However, since the shooting occurred in the early hours of the morning on August 5, 2007 and since Marquis was pronounced "dead on arrival" at the hospital, the Court assumes this first phone call about him having been shot in the arm was made a substantial time before the 2:00 p.m. telephone call the afternoon of August 5 informing Ms. Blair that her son had died.

an award of $1million.  Defendant Harris, maintaining that, at the time of the shooting, he

was acting in an authorized capacity to apprehend a criminal he observed breaking into a

car, counters that the Court should consider an award of no more than $75,000.

### III.  DISCUSSION

### A.   COMPARATIVE NEGLIGENCE STANDARDS ARE INAPPLICABLE

As an initial matter, to the extent that Defendant suggested at the hearing held in

this case that in awarding damages, the Court should take into consideration the fact that

Marquis Blair was engaged in potentially criminal conduct and, as such, should be found

to be contributorily or comparatively liable for any damages flowing from his death, it is

well-settled that comparative negligence does not apply to damages for federal

constitutional rights violations. *See McHugh v. Olympia Entertainment, Inc.*, 37 F.

App'x. 730 (6th Cir. 2007); *Quezada v. County of Bernalillo*, 944 F.2d 710, 721 (10th

Cir.1991); *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir.1979).   The *McHugh* court

explained:

> Section 1988 authorizes a federal court to use state law to facilitate but not
> to hinder proceedings in the vindication of civil rights. *Lefton v. City of
> Hattiesburg*, 333 F.2d 280, 284 (5th Cir.1964). A state law should be
> disregarded if it is inconsistent with the policy underlying § 1983:
> deterrence and compensation. *See Board of Regents v. Tomanio*, 446 U.S.
> 478, 489, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The protection afforded
> under § 1983 was not intended to differ from state to state, and federal, not
> state, common law governs the determination of damages in a § 1983
> action. *Busche v. Burkee*, 649 F.2d 509, 518 (7th Cir.1981). To apply
> comparative fault statutes in civil rights actions would result in the
> protection afforded under § 1983 to differ from state to state and would be
> inconsistent with the underlying policy of deterrence and compensation.

9

*Id.*

Accordingly, comparative negligence standards have no application in this case.

B.    DAMAGES RECOVERABLE BY PLAINTIFF

Plaintiff Rosalind Blair brings this one-count suit under 42 U.S.C. § 1983 in her capacity as personal representative of the estate of her deceased son.  There is no provision in § 1983 addressing how to evaluate damages.[7]  However, 42 U.S.C. § 1988(a) provides that if Section 1983 is

> deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause.

---

[7]  The Supreme Court has never squarely addressed the issue of damages recoverable by a decedent's estate in a Section 1983 action, either.  In *Jones v. Hildebrandt*, 432 U.S. 183, 97 S.Ct. 2283 (1977), the Supreme Court had granted a petition for certiorari to consider whether a limitation on damages in a state wrongful death statute would control in a § 1983 action brought by the victim's mother, but it dismissed the petition as improvidently granted without deciding the issue when, at oral argument, the petitioner presented an issue that was "neither alleged in her complaint in the Colorado trial court, presented in the petition for certiorari, nor fairly subsumed in the question that was presented" in the petition.  *Id.*. 432 U.S. at 183-84, 97 S.Ct. at 2284-85.

Twenty years later, the Supreme Court again granted certiorari in a § 1983 suit where the decedent's death allegedly "resulted from a deprivation of federal civil rights" by Alabama officials.  In that case, the Court intended to consider whether Alabama's wrongful death act determined the types of damages recoverable under the § 1983 claim brought by the representative of the decedent's estate.  *See Jefferson v. City of Tarrant*, 520 U.S. 1154, 117 S.Ct. 1333 (1997).  Subsequently, however, the Court dismissed the writ of certiorari as improvidently granted, finding that the state court decision on appeal was not a final judgment.  *See* 522 U.S. 75, 118 S.Ct. 481 (1997).

10

42 U.S.C. § 1988.  It is undisputed that Michigan law would be applicable in this case and, therefore, the Court will apply Michigan's civil damages laws, to the extent they are not inconsistent with federal law.

> Under Michigan's wrongful death statute,

> the court or jury may award damages as the court or jury shall consider fair
> and equitable, under all the circumstances including reasonable medical,
> hospital, funeral, and burial expenses for which the estate is liable;
> reasonable compensation for the pain and suffering, while conscious,
> undergone by the deceased during the period intervening between the time
> of the injury and death; and damages for the loss of financial support and
> the loss of the society and companionship of the deceased.

M.C.L. § 600.2922(6).

> As the Sixth Circuit observed in *Frontier Ins. Co. v. Blaty* 454 F.3d 590 (6th Cir. 2006),

> In Michigan, there is no common-law right to recover damages for a
> wrongfully caused death. As a statute in derogation of the common law, the
> wrongful death act must be narrowly construed so that only those damages
> explicitly provided for in the act are recoverable.

*Id.* at 603 (internal punctuation and citations omitted).

Michigan's wrongful death act provides for three categories of damages: (1) "reasonable medical, hospital, funeral, and burial expenses for which the estate is liable," (2) "reasonable compensation for the pain and suffering, while conscious, undergone by the deceased person during the period intervening between the time of the injury and death," and (3) "damages for the loss of financial support and the loss of the society and companionship of the deceased." M.C.L. § 600.2922(6). The first category embraces

11

losses incurred by a decedent's estate; the third category embraces losses incurred by the decedent's survivors. *Frontier Ins., supra* (citing *Bretton v. United States*, 973 F. Supp. 752, 754 (E.D. Mich. 1997)). The second category addresses the decedent's own losses, and the term "pain and suffering" covers hedonic injury. *Frontier Ins., supra*.[8] Since Plaintiff seeks "hedonic or any other damages available under Michigan law," the Court will examine each of the three categories of wrongful death damages.

1. Medical, Hospital, Funeral and Burial Expenses

Plaintiff here testified that she incurred expenses for Marquis's funeral and his burial. Damages may be recovered by a decedent's estate for such expenses under the Michigan Wrongful Death Act, and as such, are also recoverable in this Section 1983 action. *See Frontier Ins., supra*; M.C.L. § 600.2922(6) (the court may award damages for "reasonable medical, hospital, funeral, and burial expenses for which the estate is liable.") Plaintiff, however, did not testify as to the amount she expended for funeral and burial expenses and did not provide the Court with any documentary evidence establishing these sums either at the hearing or in conjunction with her supplemental brief on damages. The only evidence as to funeral/burial expenses was Ms. Blair's testimony that she could not have a funeral for Marquis like she had wanted because she had just

---

[8] "Hedonic damages" refers to damages for the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment and inconvenience affecting an individual's normal pursuits and pleasures of life. *Bretton v. United States*, 973 F. Supp. 752, 755 & n. 3 (E.D. Mich. 1997) (citing *In re Korean Air Lines Disaster of 1983*, 807 F. Supp. 1073, 1081 n. 7 (S.D.N.Y. 1992)).

12

incurred the expense of her older son's funeral two months earlier.  [*See* Hrg. Tr. pp. 19-20].

According to information compiled by the Funeral Information Society and efuneral.com, the average price of a complete funeral and burial in the Metropolitan Detroit area is $8,780.00. See http://connect.efuneral.com/sites/default/files/eFuneral%20Price%20Index%20-%20Detroit_0.pdf; *see also* http://www.funeralinformationsociety.org/html/pricesurveys/WayneCounty_PS.html. The Court finds this sum to be a reasonable amount.  Therefore, it will award Plaintiff $8,780.00 for funeral and burial expenses.

2.    Hedonic damages

With respect to the second category of damages recoverable under Michigan law, i.e., damages for pain and suffering, a decedent's estate may recover damages for a decedent's pain and suffering, but only if they were experienced by the decedent consciously "between the time of injury and death." M.C.L. § 600.2922(6); *Frontier Ins., supra; Brereton*, *supra,* 973 F.Supp. at 757 (Hedonic damages are recoverable only to the extent that the decedent experienced a loss of enjoyment of life before dying. *Id.*)  Loss of the enjoyment that would have been experienced by the decedent but for his death is *not* compensable under the act.  *See id.* ("To the extent that plaintiffs seek damages for [the decedent's] loss of enjoyment of life that would have been experienced but for his untimely demise, those damages are unavailable."); *Kemp v. Pfizer*, 947 F. Supp. 1139,

13

1146 (E.D. Mich. 1996).[9]

_____

[9] While it is true that, pursuant to 42 U.S.C. § 1988(a), the limitations on wrongful death damages under Michigan law must yield if the unavailability of hedonic damages is found to be "inconsistent with the Constitution and laws of the United States," in *Frontier Ins. Co. v. Blaty, supra*, the Sixth Circuit squarely determined that there is no such inconsistency between the Michigan wrongful death statute and federal law with respect to Michigan's limitation on hedonic damages, and explicitly held that "federal law does not require, in a section 1983 action, recovery of hedonic damages stemming from a person's death." 454 F.3d at 600. The Court explained:

> In resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at the policies expressed in them. The policies underlying § 1983 include both (1) compensation of persons for injuries caused by deprivations of their federal rights and (2) deterrence of deprivation of rights. The policy of deterrence operates through the mechanism of damages that are compensatory -- damages grounded in determinations of plaintiffs' actual losses. Thus, the basic purpose of the § 1983 damages is to compensate injured persons for their actual harm.

> Michigan's wrongful death act is consistent with the compensatory purpose of section 1983 identified by the Supreme Court. The act authorizes compensation for losses, including hedonic losses, that are experienced by the decedent before death. There is no requirement under federal law that a state go further than this in providing damages for wrongful death. The loss of enjoyment caused by death is not "actual," in the sense that is relevant here, because it is not consciously experienced by the decedent. There being no means of making the decedent whole, recovery of damages for this (or any other) post-death loss is not required to advance [and] would not advance section 1983's compensatory policy.

454 F.3d at 600-01 (citations and some internal punctuation omitted).

Further, the Supreme Court has ruled that the deterrence aspect of section 1983 also operates through compensation of actual damages suffered by the victim. *See Carey v. Piphus*, 435 U.S. 247, 256-57, 98 S.Ct. 1042 (1978) ("To the extent that Congress intended that awards under § 1983 should deter the deprivation of constitutional rights, there is no evidence that it meant to establish a deterrent more formidable than that

According to the record of this case, Marquis Blair was transported from the scene of the shooting by ambulance and was pronounced "dead on arrival" when the ambulance arrived at the hospital.  Therefore, if Marquis lived at all between the time of injury and his death, it was only for a very brief period of time.  Plaintiff admitted that she has no personal knowledge of "conscious pain and suffering" on the part of her son between the time of the shooting and his death [*see* Hrg. Tr. p. 5] and she has presented no other evidence to establish compensable hedonic damages.  Therefore, no hedonic damages will be awarded.

3.      Loss of Society and Companionship

The Michigan statute also provides for awards of "damages for the loss of financial support and the loss of the society and companionship of the deceased." M.C.L. § 600.2922(6).  As indicated above, these are damages under the Michigan wrongful death statute that compensate for losses incurred by a decedent's survivors, not for losses incurred by the decedent or the decedent's estate.  *Frontier Ins., supra*, 590 F.3d at 594.

However, the Sixth Circuit has held that a Section 1983 action for deprivation of civil rights is an action personal to the injured party.  *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984). "By its own terminology, the statute grants the cause of action 'to the party injured.'  Accordingly, it is an action personal to the injured party." *Id.*

---

inherent in the award of compensatory damages."); *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 3307, 106 S.Ct. 2537, 2543 (1986) ("[D]eterrence is also an important purpose of this system, but it operates through the mechanism of damages that are *compensatory*."  (emphasis in original).

15

In *Jaco*, the court highlighted the significant difference between a section 1983

cause of action and state law wrongful death actions:

> The § 1983 cause of action, by virtue of the explicit language of the section itself, is a personal action cognizable only by the party whose civil rights had been violated; while on the other hand, the wrongful death action is a cause of action that inures to the benefit of decedent's estate, as a result of, not the personal injury suffered by the decedent, but rather injuries to his estate caused by his wrongful death.  This court has consistently distinguished these separate causes of action. . . .

> \* \* \*

> . . . Patently, [the state's] wrongful death statue creates a cause of action in tort in favor of the decedent's heirs for damages resulting from losses of prospective advantages which have been pretermitted by the wrongful death of the victim.  Certainly, in a sense, the heirs are injured parties as a result of decedent's premature demise however, to arbitrarily conclude that their injuries resulted from an infringement of their civil rights would be sheer obfuscation of the issue.  Simply stated, the wrongful death of the decedent resulting from a tort, which gives rise to the cause of action for the benefit of his heirs, is not equivalent to decedent's personal § 1983 claim. . . .

739 F.2d at 242-43.

Jaco remains the law of the circuit, and applying *Jaco*, courts in the Sixth Circuit

consistently hold that a decedent's survivors may not recover for their own damages in a

decedent's Section 1983 action.

The Sixth Circuit reiterated this principle in *Claybrook v. Birchwell*, 199 F.3d 350

(6th Cir. 2000), a case involving a complaint brought by the children of a man who was

shot and killed by undercover police officers engaged in an anti-crime surveillance of a

market that was a known "front" for an unlawful "numbers" gambling operation.  In their

16

complaint, the plaintiff-children alleged both a wrongful death claim under Tennessee law and a claim for damages under § 1983.  The court explained that the two causes of action were distinct.  Specifically, with respect to the  Section 1983 claim, the court made clear that:

> In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the constitutional tort.  Accordingly, . . . *no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victims family.*

*Id.* at 357 (citations omitted; emphasis added).

Applying *Jaco* in *Broadnax v. Webb*, 892 F. Supp. 188 (E.D. Mich. 1995), the court held that children of a parent who was in permanent vegetative state after she attempted to swallow a bag of cocaine during a police raid of her home could not recover damages for their loss of companionship of their mother in a § 1983 civil rights suit because "the alleged denial of rights under the Constitution. . . was suffered by the parent; any damage suffered by the parent's children was merely incidental."  *Id.*  The court reasoned,  "[A] constitutional violation is something personal to the individual injured," and "a violation against one member of a family does not confer standing upon all other members of that particular family" to recover damages "[e]ven where such a claim for loss of companionship [is] limited to close family members like parents or children."  *Id. See also*, *Lee v. City of Norwalk, Ohio*, 2012 WL 3778975 at * 12 (N.D. Ohio Aug. 30, 2012) (a spouse cannot state a claim for loss of consortium under § 1983

17

because such claims are entirely personal to the direct victim of the constitutional tort),
*aff'd*, 529 F. App'x 778 (6th Cir. 2013); *Garrett v. Belmont County Sheriff's Department*,
374 F. App'x 612, 615 (6th Cir. 2010) (damages for emotional distress, loss of a loved
one or any other consequent collateral injuries will not lie under § 1983: "Those kinds of
injuries are appropriately raised in a state tort law cause of action." *Id.*); *Alexander v.
Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934, 953 (W.D. Tenn. 1999) (a decedent's
survivors may not recover for their own damages under § 1983); *Wingrove v. Forshey*,
230 F. Supp. 2d 808, 824 (S.D. Ohio 2002) (applying *Jaco* and dismissing plaintiffs' §
1983 claims brought in their personal capacities as next of kin of the decedent and
beneficiaries of his estate stating, "So long as *Jaco* remains the law of this circuit, this
Court is duty bound to follow it." *Id.*); *Robinson v. Cty of Memphis*, 340 F. Supp.2d 864,
872 (W.D. Tenn. 2004) (decedent's estate and heirs not entitled to recover for loss of
consortium in Section 1983 action).[10]

---

[10] The Court is cognizant of the fact that in *Frontier Insurance*, the court, in *dicta*
stated, "To the extent that damages stemming from the death itself might be needed to
fulfill the deterrent purpose of section 1983 (there being no compensation from the death
as such), we see no reason to think that damages for injuries suffered by the decedent's
survivors and hedonic damages suffered before death would not be sufficient in most
cases[,]" which, at first blush, may suggest that the *Frontier Insurance* court would
uphold an award of wrongful death damages under Section 1983 "for injuries suffered by
the decedent's survivors."  However, the only issue before the court in *Frontier
Insurance* was whether Michigan's limitation on hedonic damages awards under its
wrongful death statute for the decedent's "pain and suffering" and "loss of enjoyment of
life" to damages suffered by the deceased person during the period intervening between
the time of injury and death was inconsistent with the Constitution.  Damages for the loss
of financial support or for the loss of society and companionship *incurred by the
decedent's survivors* -- an entirely separate category of damages under the Michigan

Ms. Blair's testimony in this case as to how she, her children and her parents missed Marquis, the emotional distress she has suffered as a result of his untimely demise, and the counseling she sought to cope with her feelings, support only the damages she, her other children, and Marquis's grandparents personally suffered as a result of the loss of companionship of Marquis Blair. The law is clear, however, that such damages are not to be allowed in this Section 1983 action.[11]

4.   Punitive Damages

Plaintiff also asks that the Court award punitive or exemplary damages. Whereas compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's conduct, "punitive damages serve the a broader function; they are aimed at deterrence and retribution." *Arnold v. Wilder*, 657 F.3d 353, 369 (6th Cir. 2011) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell* 538 U.S. 408,

_____

Wrongful Death Act -- were not at issue in that case. Therefore, *Frontier Insurance* does not support an argument that "loss of financial support" or "loss of society and companionship" damages incurred by the victim's survivors should be awarded in § 1983 actions to effectuate the statute's deterrent purpose.

[11] Ms. Blair's testimony likely would support an award of loss of companionship damages in a state law wrongful death claim. However, no such claim was brought in this action. Evidence presented by Plaintiff's counsel in support of his claim for fees and costs, however, suggests that a separate action may have been filed in state court. *See* Plaintiff's Brief on the Issue of Damages, Doc. # 50, Pg. ID 475, 10/7/09 entries re: complaint draft; Pg. Id 477, 2/4/10 entry re: mileage to Wayne County Circuit Court for filing of amended witness list. As these costs do not coincide with the dates of filing of any such pleadings in this case, conceivably, they were filed in a separate action and such separate action may have been a state law-based wrongful death action. The Court, however, is left to speculate as to such matters as no evidence of a separate case filing has been affirmatively presented.

19

416, 123 S.Ct. 1513 (2003) (internal punctuation omitted).)  A  plaintiff who proves a

cause of action under § 1983 may recover punitive damages where the plaintiff is entitled

to an award of compensatory damages, even if nominal, where the "defendant's conduct

is shown to be motivated by evil motive or intent, or when it involves reckless or callous

indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56,

103 S.Ct. 1625, 1640 (1983).

In *Murphy v Gillman*, 551 F. Supp. 2d 677 (W.D. Mich. 2008), the court

synthesized the law regarding punitive damages in Section 1983 actions brought in the

wrongful death context:

> For causes of action brought solely under the statute, M.C.L.A. § 600.2922,
> neither punitive nor exemplary damages are available.  *Fellows v. Superior
> Products Co*., 201 Mich.App. 155, 158, 506 N.W.2d 534, 536 (1993).
> However,
>
>> [f]ederal standards govern the determination of damages
>> under the civil rights statutes. Thus, punitive damages may be
>> awarded under § 1983 even where they would not normally
>> be recoverable under the local law in the state where the
>> violation occurred.
>
> *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir.1986) (emphasis added).

*Gordon* states that the rule for awarding punitive damages is "when the defendant

willfully and intentionally violates another's civil rights or when the defendant acts with

reckless or callous indifference to the federally protected rights of others." *Id*. (citing

*Smith v. Wade*, *supra*).  *Gordon* adds that it is within the discretion of the fact-finder to

evaluate "the nature of the conduct in question, the wisdom of some form of pecuniary

punishment, and the advisability of a deterrent." *Id.*  Michigan case law similarly reflects the availability of punitive damages under § 1983 claims. *See Janda v. City of Detroit*, 175 Mich. App. 120, 129, 437 N.W.2d 326, 331 (1989) ("[P]unitive damages may be awarded under 42 U.S.C. § 1983 even where they would not normally be recoverable under the local law in the state where the violation occurred.")

Here, however, we have no evidence of record that would support a finding that Harris was motivated by an evil motive or that he willfully or intentionally violated Marquis Blair's civil rights or acted with reckless or callous indifference of those rights. The only damages evidence presented by Plaintiff was evidence of companionship damages.  No cognizable evidence was presented on the shooting incident itself which is what would be required to support a finding of intentional deprivation of rights. *See Gordon v. Norman*, *supra* ("The allowance of [punitive] damages involves *an evaluation of the nature of the conduct in question*, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." 788 F.2d at 1199 (emphasis added)). Defendant Harris did not testify.  All the Court has are hearsay police reports of supposed witnesses to the shooting -- and most of these statements would support the Defendant, at that.  Thus, there is no evidence that would support a punitive damages award in this case.

C.    <u>ATTORNEYS' FEES</u>

In its Order for Supplemental Briefing [Dkt. # 48] the Court ordered Plaintiff's

counsel to provide it with "verified documented evidence of attorneys' fees and costs sought, if any, as well as evidence of any contingent fee agreements with Plaintiff for the payment of fees and costs." *Id.* In response to the Court's order, along with her "Brief on the Issue of Damages," the Court was provided with a copy of a contingent fee agreement executed by Plaintiff which calls for a payment of 1/3 of the net of any recovery as attorney fees, plus the payment costs of "court filing fees, subpoena fees, fees for private investigators, accountants or other professionals, expert witness fees, court reporter transcripts, telephone charges, travel expenses for attorneys or investigators, copying charges and any other disbursements which the Firm deems necessary for the proper pursuit of the case." See Plaintiff's Ex. B.

Notwithstanding that Plaintiff agreed to pay, and her attorneys agreed to accept, 1/3 of Plaintiff's net recovery as attorney fees, at page 5 of Plaintiff's Brief, Plaintiff's counsel argues that the contingent fee agreement does not place a ceiling upon the fees recoverable by Plaintiff, as a prevailing party in this civil rights action, and cites *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939 (1989), as authority for this proposition.[12]

---

[12] *Blanchard* involved a case of police excessive force. The case was tried to a jury and the jury awarded the plaintiff $10,000.00 in damages ($5,000.00 in compensatory damages and $5,000.00 as punitive damages). Though the plaintiff and his attorney had entered into a contingent fee agreement which called for the payment of 40% of the award as fees, the plaintiff's attorney requested an award of fees and costs totaling more than $40,000. After reviewing billing and cost records, the district court awarded plaintiff fees in the amount $7,500.00. Plaintiff appealed seeking to increase the fee award. The Court of Appeals, however, reduced the award to $4,000.00, ruling

While it is true that pursuant to *Blanchard*, a contingent fee agreement does not place a "cap" on attorneys' fees awardable pursuant to 42 U.S.C. § 1988, *Blanchard* also makes clear that the Court is not obligated to award the amount agreed upon by the parties if it finds that amount to be unreasonable.

Section 1988 states:

. . .  In any action or proceeding to enforce a provision of sections 1981, 1982, 1093, 1985, and 1986 of this title. . . or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988.

Guided by the plain language of the statute and its legislative history, the Court in *Blanchard* determined that

"[w]hether or not [a litigant] agreed to pay a fee and in what amount is not decisive. Conceivably, a litigant might agree to pay his counsel a fixed dollar fee. This might be even more than the fee eventually allowed by the court. Or he might agree to pay his lawyer a percentage contingent fee that would be greater than the fee the court might ultimately set.  Such arrangements should not determine the court's decision. ***The criterion for the court is not what the parties agree but what is reasonable***."

489 U.S. at 92, 109 S.Ct. at 943-44, (quoting *Johnson v. Georgia Highway Express, Inc.*,488 F.2d 714, 718 (5th Cir. 1974) (internal citation and punctuation omitted)).

Thus, while "the presence of a pre-existing fee agreement may aid in determining reasonableness," 489 U.S. at 93; 109 S.Ct. at 944, it is not determinative.

_____

that the contingent fee agreement served as a cap on fees that could be awarded.  The Supreme Court reversed holding that the fee agreement did not impose an automatic ceiling on the award of attorney's fees.

23

The Court explained:

> As we understand § 1988 s provision for allowing a "reasonable attorney's
> fee," it contemplates reasonable compensation, in light of all of the
> circumstances, for the time and effort expended by the attorney for the
> prevailing plaintiff, no more and no less. **Should a fee agreement provide
> less than a reasonable fee calculated in this manner, the defendant
> should nevertheless be required to pay the higher amount. The
> defendant is not, however, required to pay the amount called for in a
> contingent-fee contract if it is more than a reasonable fee calculated in
> the usual way.** It is true that the purpose of § 1988 was to make sure that
> competent counsel was available to civil rights plaintiffs, and it is of course
> arguable that if a plaintiff is able to secure an attorney on the basis of a
> contingent or other fee agreement, the purpose of the statute is served if the
> plaintiff is bound by his contract. On that basis, however, the plaintiff
> should recover nothing from the defendant, which would be plainly
> contrary to the statute. And Congress implemented its purpose by broadly
> requiring all defendants to pay a reasonable fee to all prevailing plaintiffs,
> if ordered to do so by the court. Thus it is that a plaintiff's recovery will not
> be reduced by what he must pay his counsel. Plaintiffs who can afford to
> hire their own lawyers, as well as impecunious litigants, may take
> advantage of this provision.

489 U.S. at 93-94, 109 S.Ct. at 944-45.

The *Blanchard* Court, therefore, instructed that lower courts are to adhere to the

standards set forth in *Hensley v. Eckerhart*, 461 US. 424, 103 S.Ct. 1933 (1983).

*Hensley* directed lower courts to make an initial estimate of reasonable attorney's fees by

applying prevailing billing rates to the hours reasonably expended on successful claims.

*See also Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544 (1984) (the initial

estimate of a reasonable attorney's fee is properly calculated by multiplying the number

of hours reasonably expended on the litigation times a reasonable hourly rate).  *After* the

court makes this lodestar calculation it may adjust the calculation by other factors,

24

including consideration of any fee agreement. *Blanchard,* 489 U.S. at 94, 109 S.Ct. at 495.

For the reasons discussed below, the Court finds that 1/3 of the damage award agreed to by the parties for Plaintiff's attorney's fees is reasonable.

First, to the extent that Plaintiff's counsel seeks fees in excess of the 1/3 contingency fee agreement, the Court points out that although he was ordered to do so, Plaintiff's counsel, here has provided *no evidence whatsoever* of the fees Plaintiff "actually incurred" for his services in prosecuting the claim against Defendant Harris. "The party seeking attorney fees bears the burden of proof on the number of hours expended and rates claimed." *Granzeier v. Middleton,* 173 F.3d 568, 577 (6th Cir.1999). *See also, Hensley, supra* ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly." 461 U.S. at 433, 103 S.Ct. 1933).

According to the State Bar of Michigan *2010 Economics of Law Practice Summary Report*, the average hourly rate of a senior associate is $222, the average hourly rate of an attorney with 26 to 30 years of experience is $248, and the average hourly rate for a civil rights attorney is $255. *See Mitchell v. City of Warren*, 2012 WL 5334133 (E.D. Mich. Oct. 26, 2012) (quoting report). *See also, Auto Alliance Int'l v. U.S. Customs Serv.*, 155 Fed. Appx. 226, 228 (6th Cir.2005) (finding that "[t]he district court's $200 flat rate is well within the market rate for the Eastern District of Michigan" in a Freedom of Information Act case); *Lamar Advertising Co. v. Charter Tp. of Van Buren*, Nos.

25

04–2500 & 04–2521, 2006 WL 1133309, at *3 (6th Cir. Apr.26, 2006) (approving $200

hourly rate in a 42 U.S.C. § 1983 case involving Detroit area counsel).  Courts in the

Eastern District of Michigan, thus, have routinely found hourly rates of $135 to $250 in

Section 1983 cases to be reasonable.  *See e.g., Ash v. Boyette*, 2013 WL 4777176 (E.D.

Mich. Sept. 5 , 2013) ($135 per hour reasonable); *Black v. Law Offices of Susan Addison*

*Blush*, *P.C.,* 2013 WL 1117870 (E.D. Mich.  Mar. 17, 2013) ($200 per hour reasonable);

*Mitchell v. City of Warren*, *supra* ($250 per hour reasonable).

      The skill required by Plaintiff's counsel in prosecuting the claim against

Defendant Harris was minimal:  it only required the preparation and filing of a two-count

Complaint, the preparation and filing of a Request for Clerk's Entry of Default and a

Motion for Default Judgment, and the preparation for and attendance at a damages

hearing, and the filing of a brief on damages and fees.  Under these circumstances, the

Court finds that an hourly rate of $190 per hour for legal representation would be

reasonable.

      Next, the Court notes that Plaintiff did not prevail on every claim presented in this

action, and indeed, failed to prevail on the only claims that were substantively litigated --

i.e., those claims decided on summary judgment in favor of Defendant Wayne County.

Although it appears that Plaintiff seeks to recover all fees and costs irrespective of

whether the time and/or funds expended were necessary to succeed against Defendant

Harris, only the time expended in prosecuting the case against Harris will be

compensated. *See Fox v. Vice*, ___ U.S. ___, 131 S.Ct. 2205, 2214 (2011) ("The fee award, of course, should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work cannot be deemed to have been expended in pursuit of the ultimate result achieved.")

Here, the only claim on which Plaintiff "prevailed" -- i.e., the Section 1983 claim on which she prevailed by way of default as a result of the failure of Defendant Gregory Harris to respond to her Complaint -- entailed minimal work on her attorney's  part. Besides drafting, filing and serving the Complaint, Plaintiff's counsel only appeared at one hearing on the entry of a default judgment of liability (which was filed only after the Court entered a Show Cause Order directing Plaintiff to show cause why her claim against Defendant Harris should not be dismissed for failure to prosecute), one hearing on damages, and filed only one 6-page brief when ordered by the Court to do so.  The Court finds that the totality of this work reasonably would have taken no more than 15 hours.  Fifteen hours at $190 per hour is $2,850, which is approximately equivalent to 1/3 of the damages award as agreed to by the parties.  Therefore, the Court is satisfied as to the reasonableness of the parties' contingent fee agreement.

Plaintiff also submitted a copy of a "Statement" of the account of Rosiland Blair which purports to document $7,568.92 owing to the Fieger law firm for costs and expenses.  This "statement," however, also does not comply with the Court's Order:  It is not verified, nor does it itemize the costs and expenses other than generically (e.g.,

"document reproduction," "letter," "telephone," "postage") and by date.  There is no

explanation as to what document(s) was/were reproduced; to whom such letters were

written, to whom such phone calls were made, or the like.  Without such information, the

Court cannot determine whether the expenses billed to Ms. Blair are properly recoverable

as costs in this action against Defendant Harris.  Indeed, as noted above in this Opinion,

there are items on this "Statement" which appear to belong to some other case, apparently

filed in the Wayne County Circuit Court.  *See e.g.*, 2/4/2010 entry for $16.00 for

"Mileage -- Wayne County Circuit Court Amended Witness List" and $8.00 "Parking";

and 3/4/2010 entry for $3.15 "Document Reproduction - Complaint." *See also* 11/9/2009

"$8.00 Mileage -- Detroit Deposition" and $7.00 Parking"; and $269.20

-- Bienenstock Court Reporting Inv# 434357." None of these dates nor the noted items

correlate with any filings or activity in this case.[13]  The Court will not speculate which of

the multitude of entries for document reproduction, telephone, and postage actually

belong to this case.  The only entries which have sufficient description and which the

Court can affirmatively confirm as properly chargeable expenses (in addition to the $350

filing fee and service of process fees) are mileage and parking expenses totaling $106.00

for hand-delivery of court filings to this Court and appearances at status conferences and

hearings on June 5, 2009, January 6, 2010, February 25, 2011, July 12, 2011, and April

---

[13]  The only witness list filed by Plaintiff in this case was filed on 9/15/2009; no
Amended Witness List was ever filed in this case.  Similarly, the only Complaint filed in
this case was filed on 12/9/2008 and no depositions were used in this case.

18, 2012.

Furthermore, as with fees, Plaintiff has made no attempt to segregate the costs incurred in prosecuting Plaintiff's claim against this one Defendant who is the only party against whom Plaintiff has prevailed. Certainly, the preparation, filing and service of the Complaint, the motions for default and default judgment, and the brief on damages would be proper recoverable costs and these costs and expenses will be allowed.

Under the totality of circumstances, the Court finds that an award of $ 500.00 for fees and costs would be reasonable.

<u>CONCLUSION</u>

In sum, for the reasons set forth in this Opinion,

IT IS HEREBY ORDERED that Plaintiff is awarded damages in the amount of $8,780.00, plus costs in the amount of $500.00.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  January 27, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 27, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135